[Crim. No. 2658. First Dist., Div. One. Oct. 24, 1950.]

THE PEOPLE, Respondent, v. HARRY ROSS, Appellant.

H. O. Mundhenk and Wm. F. Stone for Appellant.

Fred N. Howser, Attorney General, and David K. Lener, Deputy Attorney General, for Respondent.

BRAY, J.—Defendant was charged with one Morgan (who pleaded guilty) with violation of (1) Penal Code section 337a, subdivision 2 (occupying a room for purposes of recording or registering bets on horse races) ; (2) subdivision 4 (recording or registering bets) ; and (3) subdivision 6 (offering and accepting bets). The court directed the jury to acquit him of count 3. The jury convicted him of counts 1 and 2. From the judgment thereon, he appealed.

CONTENTIONS

(1) Insufficiency of the evidence. (2) Error in admission of evidence. (3) Error in instructions.

FACTS

Defendant did not testify. The facts as shown by the prosecution follow: On November 16, 1948, Morgan registered at the Temple Hotel in San Francisco, being assigned room 319, at the rate of $12.50 per week. The hotel manager testified that defendant Ross was a frequent visitor at Morgan's room, that is, once or twice a day, so he requested him to register also for the room, and increased the rental to $15 per week. Defendant so registered on November 30. From then until his arrest on April 1, 1949, the weekly rental receipts were made out to "Mr. R. C. Morgan Ross, Room 319" or to "Mr. R. C.

Morgan and Ross.'' There were few outgoing phone calls from the room. There was no record of incoming calls but if there were very many the manager would have noticed it, which he did not.

On March 30 and 31, Police Office Lawler was concealed in a hotel across the street from the Temple Hotel. He noticed defendant going in and out of his hotel two or three times during an hour's period each day at 15-minute intervals. While outside defendant would stand in front of Panelli's or the Banker's Club, and receive pieces of paper from business men and women. On April 1, about 2:10 p.m., Lawler, Sergeant Hanlon and another police officer saw defendant leave the hotel. Lawler then entered it and concealed himself in a phone booth in the rear. Morgan and defendant came in and stood in front of the booth. Morgan reached under the carpet there, picked up a paper, and wrote something on it. They then proceeded upstairs. Lawler followed them to the third floor where he stationed himself near the room he thought they entered. Sergeant Hanlon came up; the two waited about three minutes; then defendant came out of the room. Lawler seized defendant, and Hanlon forced his way into room 319. Morgan was in the room and on a small desk to the left of the door were various papers and paraphernalia. Hanlon told Lawler to search the men, which he did, placing their property in two piles on the bed. Lawler took a wallet and some money and a few pieces of paper from defendant and various articles, a few pieces of paper and about $160 in currency from Morgan. There was also a number of checks, and cash totaling $346 in defendant's wallet. No key to the room was found on defendant. In the top dresser drawer Hanlon found a number of rent receipts; on the small desk was a radio and clock; and also on top of the desk was a California Turf Digest dated Friday, April 1, 1949; in the desk were a group of current markers and two cards and a piece of paper underneath a pad on top of the desk. In the second lower drawer of the dresser Hanlon found records of bets and rundown sheets dated March 30 and March 31, 1949. Twice after the arrest defendant told the police officers, with reference to Morgan, ''Let the other fellow go, after all, I am the one you are looking for.''

At the trial it was stipulated that Sergeant Hanlon was an expert on bookmaking. He then identified the various papers found in the desk and dresser drawer as ''scratch sheets'' or rundown sheets and betting markers and as betting para-

phernalia. He identified the markings on the sheet of April 1, 1949, as showing that four races had been run at Jamaica, a New York track, three races at Bowie track, and two races at Golden Gate Fields, in Albany, California. The cards found on the desk were correlated with the sheet of April 1 to show that they represented bets made that day on those races which were marked. The sergeant testified to the usual paraphernalia used by bookmakers in San Francisco and stated that there are two types of records of bets, one a sheet of paper with 20 or 30 lines on it where the bets are listed, and the other ''are small pieces of paper which are commonly called markers. That is another type of record of bet. . . . Known as an individual bet, or there may be several bets on it, but generally small pieces of paper, sometimes has the rundown number but for people who are not familiar, bettors who are not familiar with the rundown numbers they would have the horse's name.'' Sergeant Hanlon also testified that he recognized two slips of paper (Exhibit 4) as taken from Ross, and interpreted the numbers thereon as referring to horses listed in the California Turf Digest for April 1, 1949, found on the desk. There was no comparison made of the handwriting on Exhibit 4 and the handwriting of Ross. Sergeant Hanlon testified that these markers are customarily made out by the bettor and not by the bookmaker.

### 1. Sufficiency of the Evidence
Count 1.

Defendant contends that there is no evidence that defendant kept or occupied room 319 ''for the purpose of recording or registering'' bets, (a) because there was no evidence that bets were recorded or registered there, and (b) because no causal connection was shown between defendant and the paraphernalia found on the premises.

### (a) *Evidence of Recording or Registering Bets*

Sergeant Hanlon's testimony showed that the method of bookmaking used by defendant and Morgan was the ''marker'' system, that is, the bettor writes on a slip of paper in a code explained by the witness, the bet he desires to make, and a symbol to identify himself. Undoubtedly the papers which the police officer saw defendant receive from persons on the street were markers. A number of markers were found in the dresser drawer in room 319, two on the person of defendant and several on the person of Morgan. There was also a run-

down sheet for April 1. (There were rundown sheets together with markers for other days, too.) This rundown sheet is the California Turf Digest, a printed sheet on which is set forth the horses running that day at the various racetracks, their jockeys, weights, probable odds, post positions, and other data. Below each race is a space. As the radio reports the results of each race, the bookmaker lists in the space the horses which came in first, second and third, respectively, and the track prices on each, or the bookmaker may make the entries from the next day's newspapers. The rundown sheets found in the room for March 30 and 31 had practically all the spaces filled in this manner. The rundown sheet for April 1 had only some of the spaces filled. For example, of the Jamaica track races, they were only completed through the fourth race. Only the first two races were completed for Golden Gate Fields. The men were arrested before any further races were run at that track. Defendant contends that the fact that there is no evidence that any bettors either phoned or visited room 319 or that the markers were in the handwriting of either defendant, fails to show that the room was used for the purpose of recording or registering bets, as there is no proof that either defendant recorded or registered anything. This contention disregards three of the sheets which were found in the room, from which the jury could deduce that the bets actually were recorded or registered there. They are evidently the "recapitulation" sheets referred to in Sergeant Hanlon's testimony and appear to be a list of bets won on March 30 and 31. Also found with certain markers was a card, which apparently was a short recapitulation sheet of the operations for April 1. While they are not dated, a comparison of the data listed thereon with markers of the bettors and the rundown sheet of the particular date establishes the date. They show the name (or a symbol or initial of the bettor—"Betty," "L. P.," "X E W," "Bartender," "Chalky") and the amount or amounts the bettor won. Checking the amounts on this list with the marker containing his name and the rundown sheet, gives the name of the horse or horses he won on. Thus it is clear that defendant (and Morgan also), after receiving the markers from the bettors on the street, took such markers to the room where later they were checked against the rundown sheet and eventually the winnings were entered on the recapitulation sheet. Moreover, each marker found in the room bears check marks, and, in the event of a winning horse, the number of the horse or the marker is circled in a different

ink than that of the writing on the marker. In some instances notations in a second handwriting, such as ''cuff,'' are written on the marker. After the markers were checked against the rundown sheet and the results of the races and the winnings tabulated on the recapitulation sheet, they were wrapped in the rundown sheet and placed in the drawer where they were found by the police. Recording or registering a bet does not necessarily mean the type of registering or recording that occurs in a legitimate business establishment. It must be considered in regard to the type of business in which it is used. Thus, the bringing of the markers to the room, the checking of them against the rundown sheet, the recording of the winners and the amounts of their winnings on the recapitulation sheet, are enough to constitute registering or recording under the Penal Code.

As said in *People* v. *Lewis,* 91 Cal.App.2d 346, 349 [204 P.2d 919] : ''It is not necessary for the prosecution to prove by *direct evidence* that defendants occupied the room for the purpose of recording bets on horse races. The purpose for which the room was used may be shown by surrounding *circumstances,* and if the jury could reasonably conclude from the circumstances established that defendants were guilty, such verdict cannot be disturbed on appeal. These rules are so well established that citation of authority would be superfluous.''

(b) *Defendant's Connection With the Betting Paraphernalia*

It does not require much discussion to demonstrate that the evidence sufficiently connected defendant with the betting paraphernalia and the operations in room 319. In spite of defendant's contention that he was only a visitor to the room (he did not so testify—in fact, he failed to testify), the fact that he was a corenter of the room, the finding of two markers on him, his repeated visits to the room, and the testimony of Sergeant Hanlon that going to the police car defendant stated, ''Let the other fellow go, after all, I am the one you are looking for,'' sufficiently shows that defendant was connected with the operations in that room.

Defendant's failure to take the stand is significant. As said in *People* v. *Ines,* 90 Cal.App.2d 495, 499 [203 P.2d 540] : ''Appellant did not take the witness stand to deny the testimony of the police officers, nor did he offer any defense whatsoever, either to the charge of occupancy of the place or as to his possession of and writing upon the aforesaid betting

markers, all of which tended to show a causal connection between him and the betting paraphernalia commonly used for recording and registering bets on horse races. Such failure by him to explain or deny under oath the evidence woven about him was itself a potent fact for consideration by the trial judge and affords additional support for the judgment. [Citations.]''

COUNT 2

█ This count charged defendant and Morgan with recording and registering bets. The evidence does not show which defendant actually did the checking of the bets, the making out of the recapitulation sheets, or the filling in of the data on the rundown sheets. However, if defendant did not do these things himself, the evidence justifies a finding that he aided and abetted Morgan in so doing. Actually, the statement made to Sergeant Hanlon by defendant quoted above is sufficient to justify a finding that what was done in the room was done by him rather than by Morgan.

## 2. ADMISSION OF EVIDENCE

█ Defendant contends that the court erred in admitting in evidence the rundown sheets found on top of the desk, the markers found on the desk, in the desk drawer, and under the pad on top of the dresser, and the markers and rundown sheets found in the dresser drawers, on the ground that there was no evidence connecting these exhibits with defendant. This subject has been fully discussed in considering the sufficiency of the evidence. Sergeant Hanlon testified that all of these exhibits constituted betting paraphernalia. Defendant's connection therewith cannot be doubted. *People* v. *Zoffel*, 35 Cal.App.2d 215 [95 P.2d 160], cited by defendant on this subject, is not in point. There the defendant was not present when the cards in question were found, nor was there any proof that she had ever been in the apartment where they were found.

The landlord testified that he required defendant to register with Morgan for the room, because defendant was visiting Morgan frequently. Defendant argues that that, coupled with the fact that apparently Morgan always paid the rent, and that defendant had no key to the room, shows conclusively that defendant was only a visitor to room 319, and at most, a bettor, and not a participant in the bookmaking. The effect of this argument was for the jury. It is unreasonable to

believe that a mere bettor would join in the registering for a room to be used by his bookmaker. Moreover, defendant's activity in collecting markers on the street, and his statement to the officer that he was the one that they were looking for, together with his failure to testify that he was only a visitor, hardly jibes with such a contention. These facts distinguish the case from *People* v. *Fisk*, 32 Cal.App.2d 26 [89 P.2d 142], *People* v. *Schrader*, 32 Cal.App.2d 543 [90 P.2d 331], and *People* v. *Simon*, 66 Cal.App.2d 860 [153 P.2d 420], cited by defendant.

Defendant's contentions that the circumstances that he did not have a key to the room, that none of the writings were in his handwriting, etc., prove that he was not using the room for any of the acts charged, were matters to be considered by the jury as against the positive facts in the case. Concerning his contention that taking individual circumstances separated from the others fail to prove the crime charged, the language in *People* v. *Davis*, 65 Cal.App.2d 255, 258 [150 P.2d 474], is appropriate: "While this might be true when each item is considered singly and unsupported by the several other facts and circumstances presented by the evidence herein, nevertheless, when considered together, they constitute sufficient basis for the judgment."

### 3. INSTRUCTIONS

Defendant contends that the court erred in an instruction given after the jury returned to the courtroom for further instructions. The jury asked for the legal definition of recording and registering. The court then stated: "The recording or registering of a bet within the meaning of that section would, in the opinion of the court—and you will take this as the law of the case—means the writing down in a register or some record of a bet made on the result of a horse race. That would certainly include whether the actual registering or recording were done by the defendant or by someone at his direction or request *or by someone whom he aided, abetted, or encouraged with knowledge of what was done, being done, and the purpose thereof.*" (Emphasis added.) The italicized portion is that to which defendant objects, claiming that it is contrary to section 31, Penal Code, which includes as a principal in a crime one who, though not acting directly, "aid[s] *and* abet[s]" or "advised *and* encouraged" its commission. (Emphasis added.) Defendant contends that the use by the court of the disjunctive rather than the conjunctive in

its instruction constitutes prejudicial error. In *People* v. *Padilla*, 143 Cal. 158 [76 P. 889], cited by defendant, the court stated (p. 163) : ". . . it was error to instruct the jury that one who aids *or* abets is a principal—he must aid *and* abet." But then it said that neither this error, nor one concerning the admission of certain evidence, "can be deemed to have actually prejudiced the appellant." In *People* v. *Dole*, 122 Cal. 486 [55 P. 581, 68 Am.St.Rep. 50], cited by defendant, the court also refused to hold prejudicial an instruction in the disjunctive, although holding it to be erroneous. The same situation occurred in *People* v. *Mazzola*, 99 Cal.App. 682 [279 P. 211].

There is a case which defendant did not cite, *People* v. *Compton*, 123 Cal. 403 [56 P. 44], where the court held the use of the disjunctive erroneous. There were other grounds for reversal in that case, and the court did not state whether it considered the error prejudicial. Actually it merely said that the Penal Code section requires that one shall both aid *and* abet, and then states (p. 412) : "This precise error has been recently considered in the case of *People* v. *Dole*, 122 Cal. 486 [55 P. 581, 68 Am.St.Rep. 50]." In the latter case, as pointed out, *supra*, the court held that such an instruction, while erroneous, was cured by another instruction which required guilty knowledge on the part of the defendant to be shown. ■ In the case at bar, the instruction said that the aiding or abetting must be with knowledge of "what was done, being done, and the purpose thereof." Thus, the requirement that is omitted by using the disjunctive instead of the conjunctive, the guilty knowledge, is supplied by the remainder of the sentence. In effect, the jury was told that, to convict the defendant, his acts in assisting Morgan would have to be with knowledge of what was being done. Defendant argues further that the instruction means that he could have aided, abetted or encouraged his codefendant with knowledge of what *was* done, and that this could be *after* the commission of the offense, and therefore he could not be liable as a principal. However, a fair reading of the instruction does not reach this result; in the first place, the words "was done, being done" indicate that the judge was inexactly trying to say "was being done." In the second place, the instruction says "aid*ed*, abett*ed*, or encourag*ed* with knowledge of what was done"—in other words, the aiding, etc., is also in the past tense, hence coincident in point of time with the doing of the recording. Thus, the jury was not told that defendant would be guilty

if he aided someone who already had recorded or registered a bet.

Concerning a similar instruction where the word "or" was used instead of "and" the court in *People* v. *Warren,* 130 Cal. 683, 686 [63 P. 86], said: "The jury could not, in view of these instructions as a whole, have believed that defendant could be found guilty for merely aiding innocently and without guilty knowledge or intent in the commission of the offense charged." And in *People* v. *Morine,* 138 Cal. 626, 631 [72 P. 166], the court said: "There was no pretense of 'aid' given innocently, and the jury could not, in the light of the evidence, have misunderstood or misapplied the meaning of the word. Instructions are given to juries to be applied to the facts as they may find them. They should be pertinent and limited to such facts, and when their accuracy is challenged they should be construed with reference to the facts to which they were addressed, and not considered as abstract propositions of law to determine whether conditions may not exist when their giving would be erroneous."

If error, the instruction under the circumstances of the case was not prejudicial.

Judgment affirmed.

Peters, P. J., and Wood (Fred B), J., concurred.

A petition for a rehearing was denied November 8, 1950.